Good morning. May it please the Court, Andrew McCutcheon, Office of the Federal Public Defender for the District of Puerto Rico, on behalf of Defendant Appellate Hector Cardona-Vicente, I'd like to reserve two minutes for rebuttal, please. Certainly. Counsel, just a request. You did put in your brief the District Court opinion in the addendum, but the District Court opinion in part affirms a lengthy opinion from the magistrate judge, which you did not put in the addendum of the brief. Please, in the future, the rule would require you to put both opinions in. Okay? Yes, ma'am. Okay. I apologize for that. This is a case about a hunch, the hunch of a member of a Puerto Rico Police Department, that the DOJ has found, quote, regularly violates the constitutional rights of citizens through illegal searches, detentions, and arrests. The alleged basis for the hunch was the fact that Mr. Cardona-Vicente was wearing a fanny pack and was holding the bottom of that fanny pack. This, in conjunction with his non-response to a farcical question, any answer or non-answer to would be viewed as incriminating. The officer acted on this hunch to subject Mr. Cardona-Vicente to a frisk, a procedure in Terry Chief Justice Warren described as a serious intrusion upon the sanctity of a person. The officer performed this frisk without a reasonable suspicion that Mr. Cardona-Vicente was indeed armed and dangerous. This process does not comport with the Fourth Amendment and the parameters imposed upon Terry. Mr. Cardona was a passenger in a vehicle stopped by police at lunchtime on a weekday afternoon. The vehicle was stopped for a seat belt violation, not erratic driving or reckless driving or speeding in any way. The stop occurred on a major thoroughfare in front of a major mall in the city of Caguas, which is a city of 150,000 people and a municipality that covers approximately 58 square miles. The vehicle immediately pulled to the side of the road once the officers activated their emergency equipment. Two officers participated in the stop itself, allowing one to approach the driver while the second was able to provide cover for the occupants of the vehicle. The vehicle had its windows down, providing a clear view of the interior of the vehicle and its occupants. As I mentioned, three individuals were in the car, however, one of which was a minor who was under the age of 16. One of the officers approached the driver and asked for his license and registration while the other kept a watch over the other two individuals in the car. The driver candidly informed the officer that he didn't have his license but provided the vehicle registration and his name, social security number, and address. None of the occupants appeared intoxicated or under the influence of narcotics in any way. The officers did not observe any sort of furtive movements by any of the occupants. Well, they did observe the passenger at some point reach and touch his fanny pack. Yes, Your Honor. It doesn't mention that he reached and touched it. It mentioned that he was holding it. It's not clear if he was holding it from the very start. It appears from the record that that's what he was doing, holding it from the very start. He wasn't holding it. Correct. He wasn't grabbing in or grabbing around. Well, he was holding it. Correct, Your Honor. That implies he was grabbing it. Grabbing, yes, Your Honor, but not grabbing in or grabbing at, which I think is an important distinction to make because he's not trying to access the contents of whatever is in that fanny pack. Well, it's a suspicious movement because I would be holding it. Well, remember, he's sitting in a vehicle, and so for one to place their hands while sitting in a vehicle while wearing a fanny pack, to place them on the fanny pack itself is a natural location for the placement of the hands. No, I don't think it's a natural location. Natural location is not on a fanny pack unless you want to be sure that the fanny pack doesn't move around. Exactly, Your Honor. And why would you do that when the car is not holding? Well, Your Honor, if you're holding something in there that's deserving of protection, and it may be a cell phone, it may be a wallet, it may be keys, it may be prescription medication. It may be a gun, too. And, but that's a distinction that Your Honor has specifically precluded in your opinion in Wright, in which an individual... My opinion is saying everything, but in this case, in this case, under the Terry case, an officer need not be absolutely certain that an individual is armed. The issue is whether a reasonable, prudent man in the circumstances would be warranted in the belief that his safety or that of others might be in danger. That's what Terry says. Yes, sir. And why doesn't this come under that? The belief still needs to be a reasonable one. As I mentioned in the case with the hooded sweatshirt, and he was carrying a bulky and heavy object in the front portion of the hooded sweatshirt, and Your Honor specifically found that the district court errs in inferring that that item that was in the front portion of the hooded sweatshirt was indeed a dangerous weapon. And so that same rationale would apply here. Just because somebody's holding something, holding something in a fanny pack and clutching the bottom of it, it's not reasonable to infer that that item is indeed a weapon of any sort. But is it unreasonable in this situation to be alerted to, not knowing what's in the fanny pack, to be alerted to the possibility that it could hold something dangerous until other things have been ruled out or unless there's further nonsuspicious conduct? Is it unreasonable for the police officer to be on alert at that point? I think Your Honor hit the nail on the head with the phrase nonsuspicious conduct. If we had something more, like this court has found in Martinez, in Suarez. Is it unreasonable for the police officer, seeing the hand covering the fanny pack, to wonder whether something's being hidden? Yes, because I don't think it automatically follows that whatever's being grasped is automatically a dangerous weapon or firearm. But is it unreasonable not to rule that out at that point? I'm not sure whether he's acting unreasonable to take into account what he saw. That factor alone is not sufficient to warrant a Terry Frisk, and it doesn't amount to it. You do understand that's not my question? Yes, Your Honor. I think that's a factor that he can certainly consider. That's what I wanted to know. But that alone. Okay, so let's move on from there. So if we move on from there, the next thing the officer did was to ask the man if he was licensed to carry a firearm. And the man kind of looks down and shakes his head, at which point the officer, his suspicions are further aroused. The man did not say, I don't have a firearm. The man, in a sense, could be understood as acknowledging that he did have a firearm, but it wasn't licensed. And that, at that point, then increases the officer's fear that he may get shot out of this. But the other thing it does is give another basis to believe that the law has been violated, because he's carrying an  So does that mean that it happens before there is a pat-down? No, Your Honor. I think at best that can be considered a nonresponse. I think the nature of the question needs to be examined, too, because any answer to that question would be viewed as incriminating by the officer. If Mr. Cardona says yes, he has a firearm and he's going to be frisked because he has a firearm. If he says no, he has a firearm and it's not answering the question, which is what happened here. The value of that in the Terry equation is negligible, because all he did was simply not answer the question. And that, in conjunction with No, he looked down, he nodded his head in a way that was negative, giving the officer a plausible basis to think that it was an unlicensed firearm. If I could just briefly answer Go ahead. Thank you, Your Honor. He lowered his head, and according to the officer, it shook it as if to say no. So I don't think there's enough there that would lend itself to a reasonable suspicion that that individual is armed, especially given the character and content of that question, which doesn't really provide for a correct answer that won't lead to I'm sorry. I'm going to quote from the record. The other officer testified at the suppression hearing that the driver of the car told him that defendant, quote, remained silent and looked down and acknowledged nonverbally that he did not have a license to carry the firearm. Correct? That's what the record states, Your Honor. But I would submit to Your Honor that his nonresponse to that question How is shaking a head a nonresponse? What should a reasonable officer take shaking the head to mean? Nodding means one thing. Shaking the head means another thing, doesn't it? Well, I think lowering the head and shaking it either implies you don't want to talk, you don't have anything to say. I don't think you can automatically It's unreasonable to think that shaking the head means no. Especially given the question that was posed, Your Honor. Yes. I think it's a nonresponsive best. Thank you. Your Honors, may it please the Court, Susan Jorgensen on behalf of the United States. Your Honors, the defendant's Fourth Amendment rights were not unreasonably infringed in this case. The traffic stop was legitimate at its inception, and the officer reacted reasonably as the events unfolded. Here we have a case that is very fact intensive. The officer was on routine traffic patrol when he observed an individual driving without his seat belt. He pulled him over for a violation of Puerto Rico's traffic laws, and he asked the driver for his driver's license. The driver told him that his driver's license was suspended. At that point, the officer knew that there had been shootouts at traffic stops in Caguas in the past, and therefore he observed safety protocols. He went around the rear of the vehicle to take down the vehicle's information as is standard in issuing a ticket. He took down the license plate number at the rear of the car. He made sure at all points that he was not in the direct line of vision of the occupants of the vehicle to minimize any danger to himself and others. After he took down the license plate number in the back, he moved around to the side to take down the Marbeti number on the front windshield, and that's on the passenger side of the front windshield. The windows were rolled down, and he observed that the defendant, Cardona, was nervous and sweaty. And this is despite the fact that Cardona was not being cited for any infringements. And he also noticed that Cardona gripped the fanny pack in a manner which in the  infringements. The officer's experience on the job was consistent with him holding a weapon. The officer at that point reacted very calmly and kept the tone conversational and asked the individual, do you have a permit for that weapon? The individual responded with a nonverbal negative. And this is what he did. He asked the individual to exit the vehicle so that he could investigate further. Excuse me one second. I just want to make sure I understand the record clearly. He was asked, do you have a permit for that weapon or a weapon? I can check on that, Your Honor. I'm not sure if he used the word that or a. I think you'll find it uses the word a firearm. Okay. Those are my notes, too. I'm sorry? I also have it in my note a. I don't have the record before me. Yes, Your Honor. The officer also testified that he was certain at that point that the individual had a weapon. He testified that it wasn't even a question in his mind. And he testified that at that point he knew the individual had a weapon. So are we allowed to analyze beyond that? Or do we have to determine that there was a reasonable suspicion justifying a terrorist stop before he asked the question? He already had two violations of the law at the point where he observed the individual being nervous and sweaty and asked him if he had a weapon. I think that Nervous and sweaty. You know, this sweaty really put me up the wall, I have to tell you. How being sweaty in Puerto Rico in May is a suspicious activity is beyond me. And being nervous when a cop has just stopped you. Your Honor, I think really you have to look at the totality of the circumstances. The officer was testifying that he believed that the individual's responses were unusual. He said it was normal maybe to be nervous, but it wasn't just that. It was that the officer already had two violations of the law that he had uncovered. This was an area where he was being careful because there were shootouts in the past. He had not only observed that the individual was nervous and sweaty, but he also observed that the individual grabbed the fanny pack in a manner which in his experience was consistent with there being a weapon inside. And then at that point he asked the question and the individual said he did not. So the officer testified that he knew at that point that there was another violation of the law. The officer explained that had the individual answered that yes, he had a permit, there would not be a violation of the law. The officer testified that there was another heightened alert, additional heightened alert, that there is a third violation of the law. So he asks the individual to exit the vehicle and he testifies that as he does so he is using the door as a shield for his own protection and the protection of the people around him and in the vehicle just in case the individual flees or makes some unexpected movement. So the individual  uses only the fanny pack. He does not frisk the individual's outer clothing. He is limited, he limits his search to the purpose of finding a weapon. And at that point he states to the individual you have a weapon in there and the individual affirms verbally yes, I do. And thereupon he places, he reads the individual's rights and he places them under arrest. He verifies the contents of the fanny pack and he finds 14 baggies of cash, a .22 Glock .40 caliber firearm with hollow point bullets as it turns out. And at that point he says, he testifies that he believes that the driver and the passenger are engaged in illegal narcotics dealing. So he asks the Cardona are there any additional items in the vehicle of which I need to be aware and Cardona tells him that there is marijuana behind the  vehicle. And at that point they search the back. I would argue that he had reasonable suspicion at the point where Cardona makes a negative response to the question do you have a permit. And also he had probable cause at that point to arrest because the individual has just admitted that he's committed a crime. Can I ask you a question? Yes. Would it have been lawful even without reasonable suspicion to ask the occupants of the car or some of the occupants to step out of the car? Yes. The case law holds that it is lawful during a traffic stop. Okay. So assume that's the situation. Is there any testimony about the appearance of the fanny pack once he's exited the car that would suggest that there might be a weapon in it? Once he's exited the car? Yes. There is no testimony on the record about that. Okay. What the officer has at that point is only the admission by the defendant. He sees the defendant, as I said, grabbing the fanny pack in a manner which he says in his 15 years' experience is consistent with there being a weapon inside. And in addition, I know that Your Honor has requested the fanny pack be sent to Boston. If you see in the docket, there is the government's exhibit 2 has pictures of the weapon and it also has pictures of what the contents of the fanny pack, which included not only the money but the gun in a holster and cash. Yes. But didn't you say there's no testimony about how what the appearance was? That is correct. There is no testimony on the record. However, there is testimony that the officer made a judgment that based on his experience there was a weapon inside. There was a suppression hearing? Yes, there was. At the suppression hearing was the firearm inside the fanny pack at any point? Do you know? I am not aware of that, but I can tell you that defense counsel asked the officer to demonstrate the manner in which Cardone had gripped the fanny pack. And the judge had a chance to see that? That's correct, Your Honor. What was inside the fanny pack? What was inside the fanny pack was a .22 Glock in a holster. It's not a .22 Glock. It's a .40 Glock. I'm sorry. A .40 millimeter Glock with hollow point bullets inside a holster, $597 worth of cash, 14 baggies of cocaine. In addition to the Glock, was the Glock loaded? Was it lowered? Loaded. Loaded. Yes, it was. In addition to that, did it also have a magazine in addition to that? Or was the magazine the one that was loaded? From my understanding, the Glock was loaded and there was a magazine. I'm looking at the picture right now. There is a magazine that they uncovered. Does the record show how much the whole thing weighed? No, it does not, Your Honor. But, again, if Your Honors would like that sent to Boston, we can do that. No, I just want to know if the record shows it. No, that is correct. How much the fanny pack weighed. But it was entered into evidence in the trial. And we do have pictures in the exhibit. And it was quite a bit of material to be stuffed into a fanny pack. I think there would have been a considerable bulge. But there is nothing in the record that indicates exactly the weight or what it appeared. The officer simply testified that based on his 15 years' experience, he knew that there was a gun inside. If Your Honors have no further questions. Thank you. If I may, I'd like to touch on two points that the counsel made and the court made. The first being the question originally posed by the officer was whether Mr. Cardova-Vincente had a license for a weapon, not the weapon or that weapon. And then once he was asked to step outside the vehicle, and frisked, the officer then asked again whether he has a license for a weapon, which indicates that he was acting on a hunch originally. That's two questions that he asked. I thought the officer had touched the back pack, the fanny pack, and thought as a result of touching it that there was a firearm in it. And then he asks again about the firearm. Correct. Yes, ma'am. So there's two questions. The second question was whether Cardona had a firearm. But the first question was whether there is a firearm. Mr. Cardova-Vincente has a license for a firearm. There's a third. There's one in between. You have a weapon in there. No, Your Honor. Not according to the R&R. It's just two questions. And the district court's opinion adopts the R&R and includes that in there as well, Your Honor. When Martinez touched the fanny pack, he didn't then state you have a weapon in there and get the response yes? According to the district court's opinion, Your Honor, he touches the fanny pack, felt the firearm, and, quote, asked Cardona whether there was a firearm in the fanny pack. And so that would be the second question, which would then indicate that he's acting upon a hunch. He's asking two questions, one, whether or not there's a license for a firearm, and then, two, whether or not there's even a firearm in the fanny pack. I don't know whether it makes any difference whether it's A or a B. A is more inclusive because you have to have a license for every firearm in Puerto Rico so he could possibly have a license for firearms but not that firearm in particular. So when he asks whether he has a license for a firearm, that's more inclusive. I think it's just a probing question that's designed to elicit some sort of incriminating response, no matter the response itself, that would then enable the officer to subject Mr. Cardona-Vincente to a frisk. Your Honor, if I can make just one quick point on another issue. The issue that Caguas itself is a high-crime area, the officer testified— That's in your brief, isn't it? Yes, Your Honor. Okay, thank you. Thank you, Your Honor.